798 P.2d 1049

**Alan J. LESZINSKE,
Petitioner–Appellant,**

v.

**Bonnie N. POOLE, f/k/a Bonnie N.
Leszinske, Respondent–Appellee.**

**No. 11328.**

Court of Appeals of New Mexico.

Aug. 2, 1990.

Certiorari Denied Sept. 6, 1990.

William A. L'Esperance, Albuquerque, for petitioner-appellant.

Mary W. Rosner, Albuquerque, for respondent-appellee.

## OPINION

MINZNER, Judge.

Father appeals from a district court decision awarding mother primary physical custody of the three children. Upon divorce, but prior to entry of the written order awarding mother primary physical custody, she remarried in Costa Rica. Father contends on appeal that the district court had conditioned its custody award on the Costa Rican marriage between mother and her uncle and that in doing so, the trial court erred, because the marriage was cele-

brated with the intent to avoid the law of New Mexico and is repugnant to the public policy of this state. *See* NMSA 1978, § 30–10–3 (Repl.Pamp.1984) (defining incest to include marriage or sexual intercourse between uncle and niece and making incest a crime); *see also* NMSA 1978, § 40–1–7 (Repl.Pamp.1989) (declaring marriage between uncles and nieces incestuous and void). On the facts of this case, we conclude there was no error and we affirm.

## I

At the time of trial, the parents were each thirty-five years old. They had been married for fifteen years and had two daughters, aged eleven and nine, and a son, aged four. Father was the primary financial support for the family. Mother was the primary child care provider. She was also a special education instructor at a local elementary school and planned to continue her education in the mental health field. Mother retained primary physical custody of the children during the pendency of the present proceedings. The district court found that "[b]efore their marriage began breaking up, months prior to their physical separation, both parties were actively involved in parenting their children."

Mother and her mother's brother, a fifty-five-year-old man living in San Leandro, California, were involved in a relationship that began seven months before trial. There was evidence that the relationship might create future difficulties for the children, but the district court found that "[w]hether or not such pressure or hostility will be significant or will cause the children great harm is now speculative."

Father had a history of depression. Some of father's emotional difficulties were the result of the separation and divorce, and there was evidence that his state of mind was improving. However, the district court found that father was "currently not well able to provide the children the emotional support and guidance they need. He is not functioning well psychologically."

The district court concluded that it was in the best interests of the children that their mother have primary physical custo-dy. The court indicated in its oral remarks at the close of the hearing that it intended to award primary physical custody to mother if she and her uncle entered into a valid marriage, as they indicated they wanted to do and intended to do. The divorce decree was filed about three weeks later, and a month later mother and her uncle were married in Costa Rica. The district court subsequently entered findings of fact and conclusions of law that it would not be a felony for mother and her uncle to live together within a marriage recognized as valid by the laws of New Mexico and California and that:

> Primary physical custody of the children should be awarded to [mother] upon one condition: that she marry [her uncle] properly under the laws of the jurisdiction where they marry. If that condition is met, [mother] should be allowed to remove the children from New Mexico to live with her and her new husband in California.

The court awarded joint legal custody and liberal visitation, and indicated that child support should take into account father's expenses in connection with visitation.

As we understand father's position at oral argument, he does not challenge the validity of the Costa Rican marriage for all purposes. In fact, he appeared to concede at oral argument that the marriage would be recognized as valid in California. Nevertheless, he contends that the district court failed to act in accordance with New Mexico law for two reasons: (1) the court either ordered, or encouraged, mother to enter into a marriage that is against the public policy expressed in Section 30–10–3; and (2) the court failed to give sufficient consideration to the public policy expressed in that statute in weighing the best interests of the children. We address each contention separately.

We first address a procedural issue. Mother argues that father abandoned the substantial evidence issues stated in his docketing statement by failing to cite appropriate authority in his brief, as well as by failing to summarize the evidence in support of the district court's findings and

to give references to the transcript. As a result, she asks us to affirm the district court without consideration of the merits of father's appeal. *See* SCRA 1986, 12–312(D).

Father initially challenged several of the district court's findings of fact, but he failed to summarize the relevant evidence. Further, he states in his reply brief that "[s]ubstantial evidence is *not* the issue on appeal." (Emphasis in original.) We note that an issue raised for the first time in the reply brief will not be considered. *See Jaramillo v. Fisher Controls Co.*, 102 N.M. 614, 698 P.2d 887 (Ct.App.1985). Nevertheless, we reach the merits of father's appeal, which is primarily a legal argument. *Cf. Martinez v. Martinez*, 101 N.M. 493, 684 P.2d 1158 (Ct.App.1984) (where appellate court reviewed record to ascertain whether child's best interests were protected, although father had waived right to question sufficiency of the evidence).

## II

■ Father's first contention raises a serious question. Even if New Mexico would recognize an uncle-niece marriage validly performed in another jurisdiction, is it not improper for a New Mexico court to either order or encourage the marriage, when our criminal law prohibits the marriage?

The district court filed a written decision in mother's favor which contains the condition that she marry her uncle in a jurisdiction in which the ceremony would be valid. The decision was filed, however, more than six weeks after the ceremony had taken place. Thus, it is not accurate to say that the district court ordered the marriage.

To be sure, at the evidentiary hearing on the issue of custody, the district court had expressed its intent to award mother custody if she married her uncle. However, as father conceded at oral argument, mother had stated at the hearing, which predated both the marriage and the divorce decree, that she intended to marry her uncle in another country once her divorce was final. Thus, it is not accurate to say that the district court's oral remarks were improper because they encouraged a marriage prohibited by New Mexico law. Rather, we view the court's oral comments as an acknowledgement of mother's intent, as well as a ruling based on the assumption that mother would carry out her plan. We view the court's decision as simply acknowledging the reality of what happened and the factual basis for the decision to grant custody to mother. We assume that, had mother failed to marry her uncle in a jurisdiction that recognized the ceremony as valid, the district court would have given the matter of custody further consideration.

## III

■ Father cites *In re Jacinta M.*, 107 N.M. 769, 764 P.2d 1327 (Ct.App.1988), for the proposition that sexual indiscretions should be a consideration in a custody dispute. Father apparently contends that the district court failed to give sufficient weight to the fact of the relationship between mother and her uncle. The record does not support this contention.

In *Jacinta M.*, we stated that while disapproval of morals cannot be used to determine fitness of a person to care for a child, a person's associational or sexual conduct may be relevant. We stressed, however, that to make such a determination, there must be compelling evidence that the conduct in question has a significant bearing on the best interests of the child.

The record in this case reveals the district court's exhaustive inquiry into the best interests of the children. *See* NMSA 1978, § 40–4–9(A) (Repl.Pamp.1989). The court considered the effect of mother's incestuous relationship, including its moral and legal consequences, on the children. The court also considered detailed psychological analyses of the parties, their children, and the uncle. Relying in part on its own examination of the experts, the district court considered the relative benefits and detriments of placing the children with one parent or the other. In light of the district court's consideration of the wide array of

evidence in this case, we cannot say that the court either ignored the incestuous relationship or improperly evaluated the best interests of the children. *Cf. Etheridge v. Shaddock*, 288 Ark. 481, 706 S.W.2d 395 (1986) (where a father who had been awarded custody of his children was allowed to retain custody after he had married his first cousin in Texas, although such a marriage was prohibited by Arkansas law).

## IV

█ Our assumption that, under other circumstances, the district court would have given the matter of custody further consideration, raises another question, which may have been implicit in one or both of father's appellate issues. Did the district court err in taking mother's marriage plans into account when it awarded primary physical custody to mother? We think not.

The district court was in fact concerned about mother's engaging in an illegal act if prior to cohabiting with uncle in California, she had not married him in a jurisdiction that permitted uncle-niece marriages. The court's concern was based on the best interests of the children and the effect that the threat of criminal prosecution would have on them. If the district court correctly concluded that California would recognize the marriage mother planned, then the district court was entitled to conclude that the planned marriage would eliminate one of the court's concerns in analyzing the best interests of the children. Therefore, we must determine whether there was a basis for the district court's conclusion that California would recognize the marriage.

The district court also concluded that New Mexico would recognize the marriage mother planned and apparently believed that, if so, then the marriage was not a factor that precluded an award of custody to mother. We need not decide whether New Mexico would recognize the marriage mother planned in all circumstances and for all purposes. Rather, we need only decide whether, for purposes of awarding mother primary physical custody, the dis-

trict court did not err in taking the planned marriage into account. *See generally H.T. Coker Constr. Co. v. Whitfield Transp., Inc.*, 85 N.M. 802, 518 P.2d 782 (Ct.App. 1974) (findings are to be liberally construed in support of a judgment, and such findings are sufficient if a fair consideration of all of them, taken together, justifies the trial court's judgment).

In making both determinations, we must consider the principles governing the recognition of foreign marriages. Thus, even though father has said he does not contest the validity of the marriage, we believe its validity is relevant to the court's custody decision.

Section 40-1-7 states in pertinent part that: "All marriages between * * * uncles and nieces * * * are hereby declared incestuous and absolutely void." *Accord* West's Ann.Cal.Civ.Code § 4400 (1983). Section 30-10-3 makes incest a crime: "Incest consists of knowingly intermarrying or having sexual intercourse with persons within the following degrees of consanguinity: * * * uncles and nieces * * *. Whoever commits incest is guilty of a third degree felony." *Cf.* West's Ann.Cal.Penal Code § 285 (1988) (making marriage, fornication, and adultery between persons within the degrees of consanguinity within which marriages are declared to be incestuous and void punishable by imprisonment in the state prison).

██▪ Ordinarily, however, a marriage valid when and where celebrated is valid anywhere. *Ferret v. Ferret*, 55 N.M. 565, 237 P.2d 594 (1951); *In re May's Estate*, 305 N.Y. 486, 114 N.E.2d 4 (1953) (Desmond, J., dissenting); *Henderson v. Henderson*, 199 Md. 449, 87 A.2d 403 (1952); *Sutton v. Warren*, 51 Mass. (10 Met.) 451 (1845). In New Mexico, a statute, NMSA 1978, Section 40-1-4 (Repl.Pamp.1989), codifies this rule and states:

All marriages celebrated beyond the limits of this state, which are valid according to the laws of the country wherein they were celebrated or contracted, shall be likewise valid in this state, and shall have the same force as if they had been celebrated in accordance with the laws in force in this state.

An interest in comity underlies Section 40-1-4 and the rule it codifies. *See Ferret v. Ferret.* "Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states." *See Societe Nationale Industrielle Aerospatiale v. United States District Court,* 482 U.S. 522, 543, n. 27, 107 S.Ct. 2542, 2555, n. 27, 96 L.Ed.2d 461, 483, n. 27 (1987) (" 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other." *Id.* (quoting *Hilton v. Guyot,* 159 U.S. 113, 163-64, 16 S.Ct. 139, 143, 40 L.Ed. 95, 108 (1895)). The desirability of uniformity in the recognition of marital status is an additional rationale for the rule. *Henderson v. Henderson.*

The rule has exceptions. One such exception is derived from specific statutory restrictions voiding marriages for citizens who marry in foreign states for the purpose of evading the law in their home state. *See Sutton v. Warren.* Another exception pertains to marriages contracted in one state which are contrary to the strong public policy of another state. *See Restatement (Second) of Conflict of Laws* § 283 at 233 (1971); *see also In re May's Estate; Henderson v. Henderson.* The exceptions have been described respectively as (a) cases within the prohibition of positive law, and (b) cases within the prohibition of natural law. *In re May's Estate.*

Under the *Restatement* formulation, the two exceptions are actually one. The *Restatement* states the rule and its exception as follows: "A marriage which satisfies the requirements of the state where the marriage was contracted will everywhere be recognized as valid unless it violates the strong public policy of another state which had the most significant relationship to the spouses and the marriage at the time of the marriage." *Id.* at § 283(2). For purposes of this opinion, we assume that both New Mexico and California have a significant relationship to the spouses and the marriage. *See id.,* comment j at 238. Under the *Restatement* formulation, the first question is whether there is a statute invalidating the out-of-state marriage of local domiciliaries. *Id.,* comment k at 238-39. The *Restatement* suggests that, in the absence of a statute, the next question is whether the choice-of-law provisions in the forum state provide guidance on the question of whether that state would recognize the validity of the marriage under the laws of the foreign jurisdiction. *See id.,* comment j at 237-38. Finally, the *Restatement* indicates that, if no clear answers can be obtained from statutory or decisional law, the question is whether the marriage offends a sufficiently strong policy of the state with the most significant relationship. *Id.,* comment k at 237-38.

We note that the Uniform Marriage Evasion Act has been withdrawn, *see* Unif. Marriage & Divorce Act § 210, 9A U.L.A. 176, comment at 177 (1987) as inconsistent with the current comity rule contained in the Uniform Marriage and Divorce Act. *Id.* at § 210, comment at 176. The comity rule under the Act also does not incorporate the "strong public policy" exception, suggesting a developing trend away from that exception.

Arizona, for example, currently has a statute with an evasion provision: "Parties residing in this state may not evade the laws of this state relating to marriage by going to another state or country for solemnization of the marriage." A.R.S. § 25-112(C) (1976). In *In re Mortenson's Estate,* 83 Ariz. 87, 316 P.2d 1106 (1957), the court applied an evasion statute to void the marriage of two first cousins. The court explained that such a statute:

> evidences a clear intention on the part of the legislature to establish a strong public policy, that those in the prohibited degrees of consanguinity who reside in Arizona cannot marry here, nor can they marry outside the state with the intention of residing here * * *. We cannot permit the public policy of this state to be defeated by such tactics.

83 Ariz. at 90, 316 P.2d at 1107.

Section 40-1-4 contains no similar language, and the supreme court has indicated, in an analogous situation, that none

was intended. In *Gallegos v. Wilkerson,* 79 N.M. 549, 445 P.2d 970 (1968), appellants argued that on public policy grounds the court ought not recognize a common law marriage between two New Mexico residents that was contracted in Texas. Our supreme court, noting that the statute contained no language denying validity to New Mexico residents evading the statute, refused to extend its meaning to include that exception. *See also In re May's Estate; Catalano v. Catalano,* 148 Conn. 288, 170 A.2d 726 (1961) (Mellitz, J., dissenting).

California law provides that all marriages contracted outside California, which would be valid by the laws of the jurisdiction in which they were contracted, are valid in California. West's Ann.Cal.Civ. Code § 4104 (1983). Section 4104 also contains no language similar to the evasion language contained in the Arizona statute, and the California Supreme Court has expressly refused to void a marriage celebrated in Nevada with the intent to avoid California law. *McDonald v. McDonald,* 6 Cal.2d 457, 58 P.2d 163 (1936) (En Banc) (cited with approval in *Gallegos v. Wilkerson,* 79 N.M. at 553, 445 P.2d at 974).

For the reasons stated above, we believe that neither a New Mexico nor a California court would invalidate an out-of-state marriage between domiciliaries solely on the ground that the parties were attempting to avoid domestic law. Further, each state's choice-of-law rule suggests that the Costa Rican marriage would be recognized as valid. However, we have found no cases in New Mexico or California addressing the specific policy issue presented by these facts.

■ The New Mexico penal statutes indicate that incestuous marriages are contrary to the public policy of both states. *See In re May's Estate; Catalano v. Catalano; see also State v. Brown,* 47 Ohio St. 102, 23 N.E. 747 (1890). Nevertheless, the dispositive question is whether the marriage offends a sufficiently strong public policy to outweigh the purposes served by the rule of comity.

This case involves an additional consideration, which is the district court's finding that it is in the children's present best interests to be with their mother. We cannot answer the question of how New Mexico and California would treat an incestuous marriage without taking into account the purpose of the inquiry. Here, the ultimate purpose of the inquiry of the district court was to determine who would have the physical custody of the children. We need not decide whether New Mexico and California would, in all circumstances and for all purposes, recognize the marriage as valid. We need only decide whether the district court erred in concluding that, for purposes of avoiding criminal liability, a valid marriage ceremony outside California would be recognized in California, and for purposes of awarding mother primary physical custody, a valid marriage ceremony outside New Mexico could be taken into account.

The test for public policy employed by the California Supreme Court is whether the marriage is considered odious by the common consent of nations or whether such marriages are against the laws of nature. *See McDonald v. McDonald.* Although it has been suggested that uncle-niece marriages are against the laws of nature, *see United States ex rel. Devine v. Rodgers,* 109 F. 886 (E.D.Pa.1901); *In re Estate of Stiles,* 59 Ohio St.2d 73, 391 N.E.2d 1026 (1979), the Maryland Court of Appeals held that uncle-niece marriages were not considered incestuous according to generally accepted opinion because incest related only to persons in the direct line of consanguinity and brothers and sisters. *Fensterwald v. Burk,* 129 Md. 131, 98 A. 358 (1916), *cert. dismissed,* 248 U.S. 592, 39 S.Ct. 21, 63 L.Ed. 436 (1918). Despite the existence of statutes prohibiting uncle-niece marriages, the New York Court of Appeals refused to invalidate an uncle-niece marriage between citizens whose marriage was lawfully celebrated in accordance with Rhode Island law. *In re May's Estate.* We note that "[t]he weight of domiciliary law on uncle-niece [marriages] looks to the law of the place of celebration, and treats a marriage valid there as valid at the domicile also." R. Leflar, *American Conflicts Law* § 221 at 448 (3rd ed.1977).

It is difficult to conclude that uncle-niece marriages are odious by the common consent of nations. The record proper contains evidence that twenty-three South and Central American and northern European nations recognize such marriages.

In *Etheridge*, a father was awarded custody of his children upon divorce. He then married his first cousin, discovered it was void in his state, annulled the marriage, and remarried her in a neighboring state where such marriages were legal. The court held that the out-of-state marriage was valid, even though it was celebrated to avoid Arkansas law, and that the father's incestuous marriage was not a sufficient basis on its own to deny him continued custody of his children. Here, the district court's findings support the conclusion that mother's conduct was not a sufficient basis to deny her custody.

The district court has broad discretion in fashioning a child custody order to protect a child's best interests. *See* § 40-4-9(A); NMSA 1978, § 40-4-9.1(F) (Repl.Pamp. 1989). The record does not support a conclusion that the court abused its discretion in awarding mother custody in this case.

For these reasons, we think the record supports the district court's decision. Under the circumstances of this case, we believe California would recognize the Costa Rican marriage as valid, and New Mexico's public policy against incest did not preclude the district court from awarding mother primary physical custody after taking into account her plans to marry her uncle.

In sum, both states recognize the general rule, which is that a marriage valid when and where performed is valid everywhere. Neither state has a judicial decision invalidating an uncle-niece marriage validly contracted outside the state. The California penal statute appears to apply to marriages within the state and to an extra-marital uncle-niece relationship and not to a relationship between persons who have been married in a jurisdiction that recognizes the ceremony as valid. Although the New Mexico criminal statute is unclear on this point, mother plans to reside in California. Under these circumstances, we believe the district court did not err in concluding that if mother married in Costa Rica, California would recognize the marriage for purposes of avoiding criminal liability, and that New Mexico's public policy did not preclude awarding mother primary physical custody where that choice was in the best interests of the children and mother and uncle intended to reside in California.

CONCLUSION

The district court's decision awarding mother primary physical custody is affirmed. The parties shall bear their own costs and fees on appeal. *See Allen v. Allen*, 98 N.M. 652, 651 P.2d 1296 (1982).

IT IS SO ORDERED.

CHAVEZ, J., concurs.

HARTZ, J., specially concurs.

HARTZ, Judge (specially concurring).

I concur in the affirmance of the district court judgment and in Parts I, II, and III of this court's opinion. I do not join in Part IV because counsel for father stated at oral argument that he was not challenging the validity of the marriage. The majority notes that the question considered in Part IV "may have been implied in one or both of father's appellate issues." I do not think, however, that an appellant should be entitled to our review of an issue unless it is explicitly raised. The backlog in our docket does not permit us time to search for issues to consider. I recognize that the thorough, scholarly discussion in Part IV makes a contribution to the law in this area. Yet I find on our docket no lack of similarly interesting and challenging issues that, unlike this one, are clearly before us. Those are the issues we should be addressing.

I trust that in the future appellate counsel will not assume that this court has an obligation in general-calendar cases to address issues not explicitly raised.